IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **RICARDO RODRÍGUEZ-TIRADO, ANGELICA TIRADO-VELÁZQUEZ,**<br><br>  Plaintiffs,<br><br>  v.<br><br>**SPEEDY BAIL BONDS,**<br><br>  Defendant. | Civil No. 13-1671 (BJM) |

## OPINION & ORDER

This matter is before me on remand from the First Circuit. Dkt. 133. Ricardo Rodríguez-Tirado ("Rodríguez") and Angelica Tirado Velázquez ("Tirado") (collectively "plaintiffs") sued Speedy Bail Bonds ("Speedy") for damages related to the seizure and detention of Rodríguez after he skipped bail. Docket No. ("Dkt.") 1. Speedy counterclaimed for breach of contract. Dkt. 12. After a four-day trial, a jury awarded a verdict in favor of Speedy. Dkt. 106. Plaintiffs appealed. Dkt. 122. The First Circuit remanded "for further proceedings on the question of whether the jury instructions as to the tort claims accurately reflected Puerto Rico law." Dkt. 133 at 7. Parties filed memoranda, disputing the extent to which Puerto Rico has adopted the bail bondsman's common law powers. Dkts. 169, 172. As explained below, Puerto Rico does not recognize the bail bondsman's privilege to arrest as it existed at common law, and the jury instructions accurately reflected Puerto Rico law.

## BACKGROUND

As the court and parties are familiar with this case, I recite the facts here only in brief.

In 2010, Ricardo Rodríguez-Tirado ("Rodríguez") was charged with a criminal offense in New Jersey. He was released on bail, relying on Speedy and American Reliable Insurance as

sureties. Rodríguez left New Jersey for Puerto Rico and missed a court date. Accordingly, the bail bond was forfeited. Speedy hired agents ("the bounty hunters") to find Rodríguez with the hope of recovering the forfeited bail.

The bounty hunters traveled to Puerto Rico and found Rodríguez near his home in Aguadilla. They seized him, handcuffed him, shackled him, and took him to a hotel near the airport while they awaited a flight to New Jersey.

Meanwhile, Rodríguez's mother, who had witnessed the seizure, sought the advice of an attorney and made a complaint with the police. A warrant was issued for arrest of the bounty hunters, who surrendered at the police station. The bounty hunters were criminally charged, but the charges were ultimately dismissed.

Rodríguez filed suit in federal court seeking damages related to his seizure and detention, and his mother sought damages for mental anguish. Speedy counterclaimed for breach of the bail agreement.

At trial, parties disputed that law governing out-of-state bounty hunters, and the court ultimately adopted the following jury instructions:

**IX. BAIL BOND**

Now, in this case you heard about a bail bond. A bail bond is a civil contract between the government and a surety company to have a person charged with a crime released from incarceration while a trial is pending. The purpose of bail is to secure release of the accused while a charge is pending, and to assure his presence at the mandated court proceedings. The entity which signs such an agreement, a surety company, promises to pay an amount fixed by a court should the accused fail to appear in court for the designated criminal proceedings.

During the time the accused is released from incarceration after being granted bail, he is generally regarded as being in the custody of the court and the surety company, and the surety company's dominion over the accused is a continuance of the original incarceration.

### X. FALSE IMPRISONMENT

**Definition**

False imprisonment is the unlawful restraint against his will of an individual's personal liberty or freedom of movement. The main idea of a false imprisonment claim is that the Plaintiff was unlawfully detained, and you should note that because the law protects a person's freedom of movement, a person need not be physically incarcerated or arrested for him to be falsely imprisoned.

**Elements**

Under the law, false imprisonment occurs when a person, whether that person is a law enforcement officer or not, by himself or through another person unlawfully detains or causes the unlawful detention of the plaintiff. To prove this claim, the evidence must show that four elements were established. First, that Plaintiff Ricardo Rodriguez-Tirado's liberty of movement was intentionally restricted. Second, that Plaintiff Ricardo Rodriguez-Tirado was conscious of the detention. Third, that Plaintiff Ricardo Rodriguez-Tirado had not given consent to be detained. And fourth, that the detention caused damages to Plaintiff Ricardo Rodriguez-Tirado.

### XI. EXTRADITION: ARREST WITHOUT A WARRANT

Now, you heard evidence regarding efforts to return Plaintiff Ricardo Rodriguez-Tirado to New Jersey.

Extradition law says that the arrest of a person may be lawfully made by any peace officer or a private person, without a warrant, upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one year, but when so arrested the accused must be taken before a magistrate judge of a Puerto Rico court with all practicable speed and a complaint must be made against him under oath setting forth the grounds for the arrest.

Dkt. 111 at 10–12.

After the jury returned a verdict in favor of Speedy, Rodríguez and his mother appealed. On appeal, parties disputed the meaning of *Taylor v. Taintor*, 83 U.S. 366 (1873), which announced that at common law the authority of the bounty hunter to pursue, seize, and return the bail jumper was well established. As the First Circuit explained, however, the relevant question is not the United States Supreme Court's view of any common law doctrine. Rather, Puerto Rico law

controls. Dkt. 133 at 5. Because parties had not briefed the question of Puerto Rico law governing out-of-state bounty hunters, the First Circuit remanded for consideration of that issue.

## DISCUSSION

In their memorandum of law, plaintiffs contend that Puerto Rico has never adopted the rule of *Taylor*—that is, the bail bondsman's unbounded power to seize his principal. Dkt. 169 at 2. Rather, they maintain that the only Puerto Rico law applicable to out-of-state bounty hunters is Puerto Rico's Uniform Criminal Extradition Act, 34 L.P.R.A. § 1881 *et seq*. Speedy disagrees, contending that no law constrains a bailsman's ability to "perform[] his job in Puerto Rico." Dkt. 172 at 1.

As the question here implicates both the ancient common law of England as well as that law unique to Puerto Rico, I begin with some history. At common law, a bail bondsman—also called a "surety" or "bail"—had extensive power over his principal. *See generally* Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System*, 33 Hous. L. Rev. 731, 744–47 (1996). Acting with the authority of the sheriff, "'the bail ha[d] the custody of the principal, and [could] take him at any time, and in any place.'" *Id.* (quoting *Commonwealth v. Brickett*, 25 Mass. (1 Pick.) 138, 139–40 (1829)).

In due course, this concept was recognized in the United States. As early as 1798, the Supreme Court of Pennsylvania held that a surety in one state could seize his principal in another state. *See Respublica v. Gaoler*, 2 Yeates 263, 264 (Pa. 1798). Various jurisdictions affirmed this view. *See, e.g., Brickett*, 25 Mass. at 144–46; *Nicolls v. Ingersoll*, 7 Johns. 145, 153–56 (N.Y. 1810). By 1872, the United States Supreme Court acknowledged the surety's extraordinary common law power:

> When bail is given, the principal is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to

> do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done. They may exercise their rights in person or by agent. They may pursue him into another State; may arrest him on the Sabbath; and, if necessary, may break and enter his house for that purpose. The seizure is not made by virtue of new process. None is needed. It is likened to the rearrest by the sheriff of an escaping prisoner. In 6 Modern 11 it is said: "The bail have their principal on a string, and may pull the string whenever they please, and render him in their discharge."

*Taylor*, 83 U.S. at 371–72 (internal citation omitted).

Although *Taylor* announced a rule that had been widely recognized throughout the several states, *see Turner v. Wilson*, 49 Ind. 581, 586 (Ind. 1875), that rule would not forever bind the states. The First Circuit explained why:

> [T]he Supreme Court decided *Taylor* during the regime of *Swift v. Tyson*, 41 U.S. 1, 16 Pet. 1, 10 L.Ed. 865 (1842), in which courts conceived of the common law as a "brooding omnipresence in the sky," *S. Pac. Co. v. Jensen*, 244 U.S. 205, 222, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting), to which federal and state courts alike accorded respect unless altered by statute or otherwise in a particular jurisdiction; and the Supreme Court was itself the final arbiter of disputes about the content of the common law.
>
> This attitude persisted into the twentieth century until it was definitively and dramatically discarded by *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

*Rodriguez-Tirado v. Speedy Bail Bonds*, 891 F.3d 38, 41 (1st Cir. 2018). After *Erie*, states would define the nature and extent of a surety's right to seize his principal, regardless of the U.S. Supreme Court's view. *See id.*

The great majority of jurisdictions within the United States had, of their own accord, adopted the rights and privileges of the English common law. *See, e.g., Weishaupt v. Commonwealth*, 315 S.E.2d 847, 852 (Va. 1984) (explaining that Virginia adopted the English common law except that which was "repugnant to the principles of the Bill of Rights and the Constitution" or where it is "altered by the General Assembly") (citation and internal quotation marks omitted); *State v. Lingerfelt*, 14 S.E. 75, 77 (N.C. 1891) ("[U]ntil the legislature sees fit to regulate the manner in which the bail from another state is to exercise his rights, we do not feel at

liberty (especially in a case of life and death) to assume the exceptional position that the common–law method as generally recognized in the United States does not apply in North Carolina."); *Johnson v. Tompkins*, 13 F. Cas. 840, 846 (E.D. Pa. 1833) (explaining that the surety's power over his principal is "the common law of Pennsylvania as well as of England"). Still, states remained free to affirm, amend, or otherwise abrogate the common law. *See, e.g., United States v. Keiver*, 56 F. 422, 426 (C.C.W.D. Wis. 1893) (stating that statute had taken the place of the common law governing bail).

In 1926, the National Conference of Commissioners on Uniform State Laws approved a draft of the Uniform Criminal Extradition Act ("UCEA"). *Barton v. Norrod*, 106 F.3d 1289, 1296 n.6 (6th Cir. 1997). Aimed at establishing uniform extradition procedures among states, the UCEA "establishes procedures for the interstate transfer of persons against whom criminal charges are outstanding." *Cuyler v. Adams*, 449 U.S. 433, 435 n.1 (1981). After several revisions, the UCEA was finalized in 1936 and subsequently adopted by the great majority of jurisdictions, including Puerto Rico. *Id.*; *Burton v. Mumford*, 101 A.3d 577, 584–85 (Md. Ct. Spec. App. 2014). A state that has adopted the UCEA is bound by its procedures. *Michigan v. Doran*, 439 U.S. 282, 288–89 (1978).

The UCEA establishes the procedures that apply when a person wanted on criminal charges flees to another jurisdiction. It charges the governor of an asylum state with delivering up such persons to the executive authority of the demanding state. *See* P.R. Laws Ann. tit. 34, § 1881a. Where extradition is warranted, the UCEA enumerates three manners by which a fugitive may be arrested, none of which includes unilateral action by an out-of-state bounty hunter. *See* P.R. Laws Ann. tit. 34, §§ 1881f, 1881l, 1881m.

Since the rise of the UCEA, various courts have been asked to determine whether it and complementary laws abrogate the bail bondsman's common law arrest powers. Time and time again, courts have answered this question in the affirmative.

For instance, in *State v. Epps*, agents of a California surety company pursued their principal into Oregon. 585 P.2d 425, 427 (1978). They captured him in Portland, returned him to the court in California, and were thereafter convicted of kidnapping in Oregon. *Id.* Under Oregon law, a kidnapping could not occur were it authorized by law. *Id.* at 427–28. The court examined Oregon's enactment of the UCEA and found that it could authorize defendants' conduct, had they complied with its strictures: "defendants were legally authorized to arrest [their principal] and take him before a judge or magistrate with all practicable speed for legal proceedings to determine if [he] was in fact the person wanted and if the charge against him was extraditable." *Id.* at 428. Because defendants went straight to California without following this procedure, their conduct was not legally authorized. *Id.* Although defendants attempted to rely on the rule of *Taylor* to justify their conduct, the court explained that, if the common law bail bondsman's powers had ever been recognized in Oregon, they had been abrogated by legislation. *Id.* at 429. In so doing, the court explained that the common law bondsman's arrest power was extraordinary, contravening contemporary notions of civility and due process:

> These powers would be far-reaching and abusable enough in the hands of proper and responsible police authorities. The same powers in the hands of bondsmen is shocking and frightening. The bondsman is subject to less controls and is possessed of greater powers than is the law enforcement officer who would exercise counterpart functions. Hence he can act as a de facto state agent without being subject to the usual safeguards ordinarily surrounding the conduct of those officials.

> When a defendant who is free on bail flees from the jurisdiction of the court under whose control he is, no matter how metaphysically, the bondsman may pursue, arrest, and return the truant. The bondsman's powers conflict with the traditional safeguards that protect all criminally accused during the process of extradition. He can arrest and return a defendant in a summary manner beyond the powers of peace officers who must follow the procedures

> of extradition. And yet he is acting as part of the administration of the official criminal law apparatus of the state when he is doing this.

*Id.* (quoting R. Goldfarb, *Ransom: A Critique of the American Bail System* 117-18 (1965)). In enacting the UCEA and related measures, the Oregon legislature, "intended to eliminate the bail system and its attendant evils in favor of a more civilized system of apprehension and return of accused and convicted criminals." *Id.*

Later, a similar case arose in New Mexico. In *State v. Lopez*, five men representing a Texas surety pursued a principal into New Mexico. 734 P.2d 778, 781 (N.M. Ct. App. 1986). Armed, they approached the home of the principal's parents, surrounded the home, and demanded the principal. *Id.* When denied entry, they kicked down the door. *Id.* After an exchange of threats, the police intervened, arresting the surety and his agents. *Id.* Lopez, the surety, was later convicted of aggravated assault on a peace officer, attempted aggravated burglary, and aggravated assault, all with a firearm. *Id.* at 780. Lopez challenged his conviction, relying on the bail bondsman's privilege as announced in *Taylor*. *Id.* at 780. The court found Lopez's argument unconvincing, explaining that New Mexico had modified the bondsman's authority to transport principals out-of-state with its adoption of the UCEA. *Id.* at 782. Such transport could only occur where bondsmen complied with the UCEA's procedures:

> The authority of a private bondsman or his agents to arrest a bonded principal without a warrant, is qualified by the statutory requirement that the individual arrested must be promptly taken before a judge or magistrate in this state, to be held pursuant to the Uniform Criminal Extradition Act.

*Id.* at 783. In other words, the rule of *Taylor* would not immunize defendants from criminal liability.

In the instant case, Speedy intimates that cases such as these are outliers. But this view is incorrect. Rather, "numerous courts over the past 40 years have found *Taylor* abrogated by various

statutory enactments." *Collins v. Clarke*, No. 3:13-CV-00763-JAG, 2014 WL 2777438, at *3 (E.D. Va. June 19, 2014), *aff'd*, 642 F. App'x 212 (4th Cir. 2016). *See, e.g., Ouzts v. Maryland Nat'l Ins. Co.*, 505 F.2d 547, 552-553 (9th Cir. 1974), *cert. denied*, 421 U.S. 949, 95 (1975) (California Penal Code abrogated foreign bondsman's common law right to pursue, apprehend, and remove his principal from California); *Com. v. Wilkinson*, 613 N.E.2d 914, 917 (1993) ("[T]he common law right of a bondsman to seize a principal for surrender was abrogated by the UCEA."); *Collins v. Commonwealth*, 702 S.E.2d 267, 271 (Va. App. 2010) ("[T]he [Virginia] legislature directly and irreconcilably abrogated the alleged common law rule that bail bondsmen can seize a bailee at any time and in any place.") (citation and internal quotation marks omitted); *State v. Flores*, 962 P.2d 1008, 1016–17 (Haw. Ct. App. 1998) (explaining that American Samoa's UCEA required a bondsman to comply with certain arrest procedures); *see also Lund v. Seneca County Sheriff's Dep't*, 230 F.3d 196, 198 (6th Cir. 2000) (noting that a bail bondsman does not have "the broad power" to violate the law, but rather "must abide by the law of the state he enters to pursue his fugitive"); *but see Landry v. A-Able Bonding Inc.*, 870 F. Supp. 715, 721–22 (E.D. Tex. 1994).

With this background in mind, I turn to Puerto Rico law. "Puerto Rico is unique in many ways, its legal system just one of them." *Rivera-Colon v. AT&T Mobility Puerto Rico, Inc.*, 913 F.3d 200, 209 (1st Cir. 2019). When the Supreme Court decided *Taylor*, Puerto Rico was a Spanish colony. *See Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1868 (2016). At that time, "the residents of the island enjoyed Spanish citizenship and voting representation in the Spanish Parliament pursuant to the Spanish Constitution of 1876 and Autonomic Charter of 1897." *Consejo de Salud Playa de Ponce v. Rullan*, 586 F. Supp. 2d 22, 28 n.11 (D.P.R. 2008). Puerto Rico's legal system was based on civil law, which traces its origins to Roman law, not on common law, which traces

its origins to medieval England. *See generally Ace Am. Ins. Co. v. Wattles Co.*, 930 F.3d 1240, 1256–57 (11th Cir. 2019) (discussing differences between civil and common law systems).

In 1898, the Spanish-American War ended, and Puerto Rico became a territory of the United States. *Sanchez Valle*, 136 S. Ct. at 1868. But Puerto Rico's civil law tradition continued. Indeed, in 1923, Justice Holmes, writing for the U.S. Supreme Court, cautioned that federal courts should not apply "common law conceptions" in Puerto Rico, as the island "inherit[ed]" and was "brought up in a different system from that which prevails here." *Diaz v. Gonzalez*, 261 U.S. 102, 105–106 (1923). And in 1979, a unanimous Puerto Rico Supreme Court held that the Commonwealth's laws were to be "governed . . . by the civil law system," with roots in the Spanish legal tradition, not by the "common law principles" inherent in "American doctrines and theories" of the law. *Valle v. American Int'l Ins. Co.*, 8 P.R. Offic. Trans. 735, 736–738, 108 D.P.R. 692 (1979).

Today, Puerto Rico remains a civil law jurisdiction. "Even after a century of influence from the United States' common law system, Puerto Rico's legal system remains one where the legislature is the only one with power to create the law." *Martinez De Jesus v. Puerto Rico Elec. Power Auth.*, 268 F. Supp. 2d 112, 114 (D.P.R. 2003).

This is not to say that the common law is irrelevant to Puerto Rico. To the contrary, "it shall lie to employ the common law in its multiple and rich versions—the Anglo-American, the original English, the Anglo-Canadian, and others—as a point of reference for comparative law." *Valle*, 8 P.R. Offic. Trans. at 736–738. Thus, "[w]hen the Civil Code and the Supreme Court of Puerto Rico are silent on an issue," courts may turn to common law for its persuasive value. *Rivera-Colon*, 913 F.3d at 210.

In the instant case, although the laws governing bail bondsmen and their principals correspond, to some degree, with the common law, Puerto Rico has not adopted the common law outright. Rather, Puerto Rico's UCEA requires that a surety seeking extradition of a fugitive comply with certain procedures.

In Puerto Rico, "[e]very person arrested for any offense shall be entitled to be released on bail or on a condition or combination of conditions. . . ." P.R. Laws Ann. tit. 34a, § 218(a).

> The conditions imposed and the bail furnished at any time before conviction shall insure the presence of the defendant before the magistrate or the corresponding court and his submission to all orders, summons and proceedings thereof . . . and which in its absence the sureties shall pay a specified amount of money to the Commonwealth of Puerto Rico.

P.R. Laws Ann. tit. 34a, § 219(a). "The bail contract, as established herein, is an agreement between the Bondsman and the State whereby the former assures the presence of the accused before the court." *People v. Félix Avilés*, 128 D.P.R. 468, 480 (1991). In describing "the nature and purpose of the bail contract, as well as the surety's liability to the State," Puerto Rico lawmakers have stated as follows:

> The function of bail is to guarantee to the Government the appearance of the defendant at the judicial proceedings.
>
> Once the bail is admitted the surety is obliged to ensure the presence of the defendant at the judicial proceedings brought against him until a judgment is entered. The defendant's failure to appear at one of the phases of the proceedings without justifiable cause is a breach of the commitment made to the court and therefore bail must be forfeited in favor of the Commonwealth of Puerto Rico.
>
> The Government has the responsibility of keeping those persons accused of violating the law *in custody*. However, *it has consented to being substituted by the surety* upon his request. Therefore, noncompliance by the person on bail is a noncompliance by *the custodian* who must answer with the bail posted.

*Id.* (emphasis added). In other words, when an accused is released on bail, the custody of the accused passes from the hands of the state to those of the surety. The surety retains a duty to assure the accused's presence throughout proceedings. *People v. Vazquez*, 9 P.R. Offic. Trans. 346, 348–

49 (1979). If the accused does not appear, the bail may be forfeited. *See* 34 L.P.R.A. App. II, Rule 227. Once the surety surrenders the principal, "the custody is transferred from the surety to the State." *Vazquez*, 9 P.R. Offic. Trans. at 349.

The notion that the surety holds the principal "in custody" undoubtedly existed at common law. *See Albright v. Oliver*, 510 U.S. 266, 278 (1994) (Ginsburg, J. concurring) ("The common law thus seems to have regarded the difference between pretrial incarceration and other ways to secure a defendant's court attendance as a distinction between methods of retaining control over a defendant's person."); 3 William Blackstone, *Commentaries on the Laws of England* 290 (1768) (referring to the bail arrangement as a means of placing the defendant in the "friendly custody" of the surety). That Puerto Rico law and common law have something in common, however, does not mean that Puerto Rico has adopted the rule of *Taylor*. Rather, as explained below, in the case of out-of-state bounty hunters, the procedures established by Puerto Rico's enactment of the UCEA govern.

On May 24, 1960, the Puerto Rico legislature adopted the UCEA, 34 L.P.R.A. § 1881 *et seq.* ("the Act"). *Sánchez v. Superintendente Cárcel*, 4 P.R. Offic. Trans. 1208, 104 D.P.R. 862, 864 (1976). The Act establishes procedures governing the arrest of fugitives from another jurisdiction who are found within Puerto Rico. *See* P.R. Laws Ann. tit. 34, §§ 1881f, 1881l, 1881m. Such arrests may proceed by one of three methods. First, the governor of Puerto Rico may solicit a judge for an arrest warrant, which will be executed by a peace officer or another fit person. *Id.* § 1881f. Second, any credible person may go to a magistrate and testify that an individual on the island is a fugitive from justice. Upon proper testimony, the magistrate may issue an arrest warrant, and a peace officer will find the alleged fugitive and bring him before the magistrate to answer the charge. *Id.* § 1881l. Third, any peace officer or a private person may make a warrantless arrest if

he has "reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one (1) year." *Id.* § 1881m. Such arrest is only proper, however, where the accused is taken "before a magistrate of a Court of First Instance with all practicable speed," complaint is made against him "under oath setting forth the ground for the arrest," and the principal is permitted to answer the charge. *Id.*

Speedy maintains that it is not bound by these laws. Rather, because Rodríguez entered a bail agreement, Speedy contends that no Puerto Rico law constrains its authority to enter Puerto Rico, seize one of its inhabitants, and take him to New Jersey without resort to any of Puerto Rico's legal processes.

I cannot square this view with Puerto Rico's enactment of the UCEA. With the UCEA, the Puerto Rico legislature established various procedural safeguards protecting those alleged to be fugitives. For instance, even where the executive authority of another jurisdiction seeks extradition, the governor of Puerto Rico will not blindly comply with such request. Rather, a sister sovereign must provide sufficient proof that extradition is proper, including an authenticated copy of "the indictment, information, affidavit, judgment of conviction or sentence." *Id.* § 1881b. Likewise, a warrant to arrest the accused must "substantially recite the facts necessary to the validity of its issuance." *Id.* § 1881f. Where arrest is made upon credible testimony to a magistrate, the arrestee must be brought to a magistrate "to answer the charge or affidavit":

> No person arrested upon such warrant shall be delivered over to the agent whom the executive authority demanding him shall have appointed to receive him unless he shall first be taken forthwith before a judge of the Court of First Instance of Puerto Rico, who shall inform him of the demand made for his surrender and of the crime with which he is charged, and that he has the right to demand and to procure legal counsel.

*Id.* § 1881i. Similarly, a warrantless arrest may only be made on reasonable information that the individual stands charged with a felony, and

> when so arrested the accused must be taken before a magistrate of a Court of First Instance with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in §1881l of this title; and thereafter his answer shall be heard as if he had been arrested on a warrant.

*Id.* § 1881m. Moreover, once an alleged fugitive is seized, Puerto Rico law "guarantees the arrestee the right to attack the legality of the arrest through a petition for habeas corpus." *Sánchez*, 104 D.P.R. at 865.

These safeguards help ensure an orderly and just extradition and offer the accused limited, yet meaningful, procedural rights. Neither the governor of Puerto Rico nor its courts may inquire into the guilt or innocence of the arrestee. P.R. Laws Ann. tit. 34, § 1881i. However, they may inquire into the arrestee's identity. *Id.* Such inquiry is significant, helping to avoid situations of mistaken identity, where wholly innocent individuals find themselves taken away from the island of Puerto Rico and brought to a foreign court before they can show that the bondsman seized the wrong person. Were Speedy's interpretation to stand, the rights the UCEA affords alleged fugitives would be rendered meaningless whenever an out-of-state bounty hunter was involved. Clearly, this would undermine the legislature's purpose. Indeed, the legislature made obvious that it takes seriously the rights afforded an accused during extradition: an officer who delivers an alleged fugitive to an agent of the demanding state "in willful disobedience" of the requirement that the accused first be brought before a Puerto Rico judge is guilty of a misdemeanor. *Id.* § 1881j.

Of course, under the UCEA an alleged fugitive may waive his rights. *Sánchez*, 104 D.P.R. at 864. A surety might argue that, by entering a bail agreement, the principal waived any rights the Puerto Rico legislature otherwise created. This view too, however, would undermine the UCEA. Indeed, waiver itself occurs by a certain process: the accused must make said waiver in writing "in the presence of one of the judges of the Court of First Instance of Puerto Rico" and only after the magistrate has informed the accused "of his rights to the issuance and service of a warrant of

Case 3:13-cv-01671-BJM   Document 184   Filed 09/29/20   Page 15 of 18

Rodríguez-Tirado, et al. v. Speedy Bail Bonds, Civil No. 13-1671 (BJM)                    15

extradition and to obtain a writ of habeas corpus." P.R. Laws Ann. tit. 34, § 1881y. The signing of a bail agreement does not conform to this procedure.

And even if, arguendo, the accused could waive his rights under the UCEA by entering a bail agreement, that fact would not permit the bail bondsman to ignore the UCEA's procedures. Where another jurisdiction seeks an alleged fugitive who also stands charged with a crime in Puerto Rico, Puerto Rico law permits the governor, as a matter of discretion, to "either surrender [the accused] on demand of the Executive Authority of another state or hold him until he has been tried and discharged or convicted and punished in Puerto Rico." *Id.* § 1881r. And Puerto Rico has not waived this right:

> Nothing in this chapter contained shall be deemed to constitute a waiver by the Commonwealth of Puerto Rico of its right, power or privilege to try such demanded person for crime committed within Puerto Rico, or of its rights, power, or privilege to regain custody of such person by extradition proceedings or otherwise for the purpose of trial, sentence, or punishment for any crime committed herein, nor shall any proceedings had under this chapter which result in, or fail to result in, extradition be deemed a waiver by the Commonwealth of Puerto Rico of any of its rights, privileges, or jurisdiction in any way whatsoever.

*Id.* § 1881z. In other words, the Act not only creates rights for the accused, but it also acknowledges that the People of Puerto Rico enjoy the right to see their laws enforced. Under Speedy's theory, the People of Puerto Rico would lose that right by virtue of the unilateral action of a bail bondsman.

Finally, Puerto Rico's purpose in enacting the UCEA advises against recognizing the bail bondsman's arrest power as it existed at common law. The Act must "be so interpreted and construed as to effectuate its general purposes to make uniform the laws of those states which enact it." *Id.* § 1881bb. As explained above, a growing number of courts have found that the UCEA and other laws abrogate the common law bondsman's power to arrest. To permit a bail bondsman to ignore the UCEA's procedures in Puerto Rico even though he must follow them in other jurisdictions would undermine the legislature's aim to make extradition laws uniform. *See*

*Wilkinson*, 613 N.E.2d at 917 (explaining that abrogation of the bondsman's common law power to arrest would make for a "more efficient, predictable, and uniform method of interstate extradition").

Given that Puerto Rico's enactment of the UCEA establishes clear procedures for the arrest of alleged fugitives in Puerto Rico, I see no need to resort to common law to find a special arrest privilege for bail bondsmen. Doing so would undermine Puerto Rico's statutory scheme. Further, I agree with those courts that have noted that the UCEA's procedures for the arrest of alleged fugitives are more consistent with contemporary notions of due process than was the bail bondsman's extraordinary power to arrest at common law. *See Wilkinson*, 613 N.E.2d at 917; *Lopez*, 734 P.2d at 783; *Epps*, 585 P.2d at 429. In short, an out-of-state bondsman seeking a fugitive in Puerto Rico is constrained by Puerto Rico's enactment of the UCEA. *Accord Lund*, 230 F.3d at 198 ("The bondsman may be authorized under the law of the state where a bond is made to retrieve bail jumpers, but he must abide by the law of the state he enters to pursue his fugitive.").

Turning now to the question on remand, "whether the jury instructions as to the tort claims accurately reflected Puerto Rico law," Dkt. 133 at 7, I find that they did. First, the jury instructions explained false imprisonment as follows:

> False imprisonment is the unlawful restraint against his will of an individual's personal liberty or freedom of movement. The main idea of a false imprisonment claim is that the Plaintiff was unlawfully detained, and you should note that because the law protects a person's freedom of movement, a person need not be physically incarcerated or arrested for him to be falsely imprisoned.
>
> **Elements**
>
> Under the law, false imprisonment occurs when a person, whether that person is a law enforcement officer or not, by himself or through another person unlawfully detains or causes the unlawful detention of the plaintiff. To prove this claim, the evidence must show that four elements were established. First, that Plaintiff Ricardo Rodriguez-Tirado's liberty of movement was intentionally restricted. Second, that Plaintiff Ricardo Rodriguez-Tirado was conscious of the detention. Third, that Plaintiff Ricardo Rodriguez-Tirado had not

> given consent to be detained. And fourth, that the detention caused damages to Plaintiff Ricardo Rodriguez-Tirado.

Dkt. 111 at 11. This is an accurate recitation of cause of action for false imprisonment in Puerto Rico. *See Berg v. San Juan Marriott Hotel & Stellaris Casino*, 261 F. Supp. 3d 213, 218 (D.P.R. 2016) (citing *Castro Cotto v. Tiendas Pitusa*, 159 D.P.R. 650, 656 (2003)).

Next, the jury instructions explained the nature of the bail bond and the surety/principal relationship as follows:

> During the time the accused is released from incarceration after being granted bail, he is generally regarded as being in the custody of the court and the surety company, and the surety company's dominion over the accused is a continuance of the original incarceration.

This general proposition is in keeping with Puerto Rico's conception of the bail contract and the surety's responsibilities. *See Félix Avilés*, 128 D.P.R. at 480 (explaining that, under the bail contract, the state agrees to be substituted by the surety and the surety becomes custodian).

Finally, the jury instructions described lawful arrest for purposes of extradition as follows:

> Extradition law says that the arrest of a person may be lawfully made by any peace officer or a private person, without a warrant, upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one year, but when so arrested the accused must be taken before a magistrate judge of a Puerto Rico court with all practicable speed and a complaint must be made against him under oath setting forth the grounds for the arrest.

Dkt. 111 at 12. This is an accurate reflection of Puerto Rico's enactment of the UCEA.[1] *See* P.R. Laws Ann. tit. 34, § 1881m.

In sum, although Puerto Rico recognizes that a principal is in the custody of the surety, it does not recognize the bail bondsman's unfettered power to arrest as it existed at common law. Rather, with its enactment of the UCEA, Puerto Rico established procedures applicable to out-of-

---

[1] I note that plaintiffs seem to believe the jury instructions adopted the rule of *Taylor*. As reflected here, the court did not instruct the jury that bounty hunters enjoy any special arrest privilege beyond that to which a layman is entitled under Puerto Rico's UCEA.

state bounty hunters seeking to extradite their principals. These were included in the jury instructions.

**IT IS SO ORDERED**.

In San Juan, Puerto Rico, this 29th day of September, 2020.

                                                 **S/Bruce J. McGiverin**
                                                 BRUCE J. MCGIVERIN
                                                 United States Magistrate Judge